UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
NATHAN TEMPEY,

       Plaintiff,

  -against-

          MEMORANDUM & ORDER

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY,     1:20-CV-5212 (ENV) (SJB)

       Defendant.
-----------------------------------------------------------

VITALIANO, D.J.

  On August 9, 2018, plaintiff Nathan Tempey, a freelance journalist, filed FOIA requests with the Department of Homeland Security ("DHS") seeking information about the origins of a press release related to the first Trump administration's "policy" to secure the southern border through the construction of a physical wall (the "Border Wall"). Following DHS's redaction of certain documents, Tempey filed suit on October 29, 2020, seeking declaratory, injunctive, and other appropriate relief to compel the release of agency records. *See* Compl., ECF No. 1, ¶ 1. Before the Court is DHS's motion for summary judgment and Tempey's cross-motion for summary judgment, both pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth below, DHS's motion for summary judgment is GRANTED, and Tempey's cross-motion is DENIED.[1]

---

[1] Citations to pages of the parties' briefing refer to the Electronic Case Filing System ("ECF") pagination.

Background[2]

On January 25, 2017, President Donald J. Trump, through the Executive Office of the President, issued Executive Order 13767, titled "Border Security and Immigration Enforcement Improvements." Def. Rule 56.1 Stmt., ECF No. 39, ¶ 1. The Order stated: "It is the policy of the executive branch to: (a) secure the southern border through the immediate construction of a physical wall on the southern border, monitored and supported by adequate personnel so as to prevent illegal immigration, drug and human trafficking, and acts of terrorism." *Id.*

Over a year later, on February 15, 2018, DHS issued a press release titled, "We Must Secure The Border And Build The Wall To Make America Safe Again." *Id.* ¶ 2. The Press Release provided various statistics to support its central claim that "walls work" when it comes to effective border security.[3] Facially innocuous, the Press Release went largely ignored for many months. In fact, the public may not have given the Press Release a second thought were it not for the work of online sleuths, who in June 2018 advanced claims that they had discovered white supremacist slogans embedded in its title and text. *Id.* ¶ 3.

For example, articles from June 2018 reported that the title of the Press Release resembled the length and syntactical structure of a common white supremacist slogan known as "The 14 Words"—"We Must Secure The Existence Of Our People And A Future For White Children." Tempey Decl., ECF No. 36, ¶ 4; *see* Luke O'Neil, *Is the DHS Smuggling White Supremacist Codes Into Government Press Releases*, MEDIUM (Jun. 29, 2018), https://medium.com/@lukeoneil47/is-the-dhs-smuggling-white-supremacist-codes-into-government-press-releases-3f82a1b4d51a;

---

[2] The facts are drawn from the pleadings and the submissions of the parties on their cross-motions, including statements of undisputed material facts made pursuant to Local Civil Rule 56.1, as well as the Press Release itself.

[3] Press Release (U.S. Dep't of Homeland Security Feb. 15, 2018), https://www.dhs.gov/archive/news/2018/02/15/we-must-secure-border-and-build-wall-make-america-safe-again.

Chauncey Devega, *Did Trump administration send a coded signal to neo-Nazis? Maybe not – but is that reassuring?*, SALON (July 6, 2018), https://www.salon.com/2018/07/06/did-trump-administration-send-a-coded-signal-to-neo-nazis-maybe-not-but-is-that-reassuring/. Articles also flagged that instead of using percentages or round number denominators like 10 or 100, the Press Release curiously used 88 as a denominator, which was a possible reference to a popular white supremacist symbol standing for "Heil Hitler."[4] *See* Aviya Kushner, *Are '14' and '88' Nazi Dog Whistles In Border Security Document – Or Just Numbers?*, FORWARD (Jun. 28, 2018), https://forward.com/culture/404371/are-14-and-88-nazi-dog-whistles-in-this-homeland-security-document-or-just/.

Based on his perception of the similarities between the content of the Press Release and President Trump's speeches and policies, Tempey believed that the White House either drafted or helped to draft the Press Release. Tempey Decl. ¶ 5. For that reason, on August 9, 2018, Tempey filed FOIA requests with DHS seeking more information about the origins of the Press Release. Def. Rule 56.1 Stmt. ¶ 5. As drafted, his request sought records concerning four categories of information: (1) "All documentation used in formulating the press release, including program announcements, records generated at meetings, events, press conferences and/or interviews, and any other significant documentation used in formulating the release; (2) Background material including background papers, news clippings, documents on program activities, reports on program and policy developments, news releases, fact sheets, and other reference material used in formulating the press release; (3) All messages from senior leadership of the public affairs office to public affairs employees announcing new policies and revisions to existing policies from

---

[4] According to the Anti-Defamation League, 88 is a white supremacist numerical code for 'Heil Hitler" because H is the eighth letter of the alphabet, and so 88 is a shorthand for HH, or "Heil Hitler." *See* https://www.adl.org/resources/hate-symbol/88.

January 1, 2018 to the present; and (4) All correspondence between public affairs employees and reporters regarding the press release dated February 15, 2018." *Id.* ¶ 6.

DHS had already commenced a search for responsive records when plaintiff submitted his FOIA request, as the Press Release was, unsurprisingly given the public speculation, the subject of numerous prior requests. *Id.* ¶ 8. On March 27, 2020, DHS responded by directing plaintiff to a publicly accessible website, the DHS FOIA library, which contained 24 pages of responsive material. *Id.* ¶¶ 10–11. Believing that DHS's response was inadequate, plaintiff filed an administrative appeal on April 7, 2020. *Id.* ¶ 12. On July 15, 2020, the Administrative Law Judge issued a final decision on plaintiff's appeal and provided him the right to seek judicial review in the district court. *Id.* ¶ 13.

Plaintiff filed the operative Complaint in this action on November 12, 2020. *Id.* ¶ 14. After negotiating with plaintiff to identify mutually acceptable search terms, DHS conducted an expanded search for documents. *Id.* ¶ 16. The expanded search spanned the extended period of January 1, 2018, to September 1, 2018, and included a search of the email records of 180 senior personnel in the Offices of Policy, Public Affairs, and Congressional Relations. *Id.* On March 17, 2022, DHS released 236 pages of materials to plaintiff and indicated that 19 pages had been sent to another agency for consultation. *Id.* ¶ 17. DHS redacted portions of the released documents pursuant to FOIA Exemptions 5 and 6. *Id.* On August 3, 2022, following further agency consultation, DHS released the 19 pages that had previously been withheld from the March production, redacting again portions of the released materials pursuant to Exemptions 5 and 6. *Id.* ¶ 18

Following discovery, defendant moved for summary judgment dismissing this action, arguing that its redactions were appropriate under FOIA. Plaintiff cross-moved for summary judgment, requesting that the disputed documents be released without redactions.

Legal Standards

Summary judgment shall be granted in the absence of a genuine dispute as to any material fact and upon a showing that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). "[A] fact is material if it 'might affect the outcome of the suit under the governing law.'" *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene of N.Y.*, 746 F.3d 538, 544 (2d Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986)). A dispute over material facts is "genuine" where "a reasonable jury could return a verdict for the nonmoving party" based on the evidence cited. *Anderson*, 477 U.S. at 248. In determining whether genuine issues of fact exist, "'the district court may not properly consider the record in piecemeal fashion, trusting innocent explanations for individual strands of evidence.'" *Moll v. Telesector Res. Grp., Inc.*, No. 20-cv-3599, 2024 WL 820179, at *4 (2d Cir. Feb. 28, 2024) (quoting *Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 45 (2d Cir. 2019)).

FOIA, which is the substantive focal point of this case, "permits any person to request records from a government agency, so long as they reasonably describe the record(s) sought and comply with other terms of the statute." *Muset v. Ishimaru*, 783 F. Supp. 2d 360, 372 (E.D.N.Y. 2011). As such, FOIA requires United States government agencies to disclose agency records upon receiving a properly submitted written request. 5 U.S.C. § 552(a)(3)(A). Courts have recognized that FOIA establishes a "strong presumption in favor of disclosure," *Cook v. Nat'l*

*Archives & Records Admin.*, 758 F.3d 168, 173 (2d Cir. 2014), but an agency may withhold documents responsive to a request if the request falls within one of the nine categories of agency records that are exempted from release, as delineated in 5 U.S.C. § 552(b). *See Halpern v. Federal Bureau of Investigation*, 181 F.3d 279, 287 (2d Cir. 1999). Though, even if an exemption applies, the FOIA Improvement Act requires the agency to disclose documents unless it "reasonably foresees that disclosure would harm an interest protected by the exemption" or that "disclosure is prohibited by law." 5 U.S.C. § 552(a)(8)(A)(i); *Seife v. U.S. Food and Drug Admin.*, 43 F.4th 231, 234 (2d Cir. 2022).

Because FOIA cases do not ordinarily involve disputed facts, summary judgment is the preferred mechanism for resolving FOIA actions. *See, e.g.*, *Zhao v. U.S. Dep't of State*, 320 F. Supp.3d 505, 509 (E.D.N.Y. 2018), *aff'd*, 776 F. Appx. 733 (2d Cir. 2019); *Stahl v. U.S. Dep't of Justice*, No. 19-cv-4142, 2022 WL 742872, at *3 (E.D.N.Y. Mar. 11, 2022). To obtain summary judgment in a FOIA action, the defendant agency must show that it conducted an adequate search for responsive records and that any withheld documents fall under a FOIA exemption or exclusion. *Carney v. U.S. Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994). "While the defending agency has the burden of showing that any withheld documents fall within an exemption to FOIA, [courts] accord a presumption of good faith to an agency's affidavits or declarations, such that when an agency provides reasonably detailed explanations to support its decision to withhold a document, its justification is sufficient if it appears logical and plausible." *Behar v. U.S. Dep't of Homeland Sec.*, 39 F.4th 81, 88 (2d Cir. 2022) (internal quotations omitted). "Conversely, summary judgment in favor of the FOIA plaintiff is appropriate when an agency seeks to protect material which, even on the agency's version of the facts, falls outside the preferred exemption." *Brennan Ctr. for Just.*

*at N.Y. Univ. Sch. Of L. v. Dep't of Homeland Sec.*, 331 F. Supp. 3d 74, 83 (S.D.N.Y. Aug. 3, 2018) (internal quotations omitted).

The Court is also mindful that, where the Second Circuit has not addressed a specific FOIA issue, it often turns to the D.C. Circuit for guidance. *See, e.g.*, *Main St. Legal Servs., Inc. v. Nat'l Sec. Council*, 962 F. Supp. 2d 472, 474 (E.D.N.Y. 2013); *Roman v. Nat'l Sec. Agency*, No. 07-cv-4502, 2009 WL 303686, at *5 n.3 (E.D.N.Y. Feb. 9, 2009) ("The Second Circuit has evidenced a willingness to look at the law of other circuits—particularly the D.C. Circuit—in the area of FOIA.").

Discussion

Attention is immediately drawn to FOIA Exemption 5, which is one of the authorities upon which DHS relies to deny Tempey's claim. FOIA Exemption 5 shields from disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency, provided that the deliberative process privilege shall not apply to records created 25 years or more before the date on which the records were requested." 5 U.S.C. § 552(b)(5). Courts have interpreted Exemption 5 to encompass traditional common-law privileges against disclosure, including the so-called "deliberative process privilege," which shields "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Ahmed v. U.S. Citizenship and Immigration Servs.*, No. 11-cv-6230, 2013 WL 27697, at *4 (E.D.N.Y. Jan. 2, 2013) (quoting *Nat'l Council of La Raza v. Dep't of Justice*, 411 F.3d 350, 356 (2d Cir. 2005).

Specifically, "[t]he deliberative process privilege is designed to promote the quality of agency decisions by preserving and encouraging candid discussion between officials." *Nat'l Council of La Raza*, 411 F.3d at 356. This privilege "rests on the obvious realization that officials

will not communicate candidly among themselves if each remark is a potential item of discovery and front-page news, and its object is to enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8–9 (2001). With a real world understanding of the government process, the D.C. Circuit observed that, "[i]n enacting Exemption 5, Congress determined that the 'efficiency of Government would be largely hampered if, with respect to legal and policy matters, all Government agencies were prematurely forced to operate in a fishbowl.'" *Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992) (quoting S. Rep. No. 813, 89th Cong., 1st Sess. 9 (1965)).

In conformity with its *raison d'etre*, in order for the deliberative process privilege to apply, the document must be "(1) "'predecisional,' *i.e.*, 'prepared in order to assist an agency decisionmaker in arriving at his decision,' and (2) 'deliberative,' *i.e.*, 'actually related to the process by which policies are formulated.'" *Nat'l Council of La Raza*, 411 F.3d at 356 (quoting *Grand Cent. P'ship v. Cuomo*, 166 F.3d 473, 482 (2d Cir. 1999)). "To find that a document is predecisional, a court must be able to pinpoint an agency decision or policy to which the document contributed, or was intended to contribute." *Brennan Ctr. for Just. At N.Y. Univ. Sch. Of L.*, 331 F. Supp. 3d at 93 (citing *Heartland All. for Human Needs & Human Rights v. U.S. Dep't of Homeland Sec.*, 291 F. Supp. 3d 69, 79 (D.D.C. 2018)). Regarding the second prong, "a document is deliberative if the materials bear on the formulation or exercise of agency policy-oriented judgment." *Id.* (citations and quotations omitted).

With this understanding of the rationale for withholding documents from disclosure, Tempey's unsatisfied FOIA requests, which target different categories of documents, must be evaluated. He first challenges DHS's redactions of communications regarding drafts of the Press

Release pursuant to Exemption 5. These documents include requests such as "let me know of any changes" and notes to see "edits below." Def. Mot., ECF No. 41, at 16. These documents also include pages reflecting track changes and internal comments on drafts of the Press Release. *Id.* The Government argues that these materials are predecisional deliberative work product properly withheld under FOIA Exemption 5 because the documents "represent DHS's collaboration with other government offices to determine how best to relay to the public how the administration, through DHS, intended to ensure border security and its reasoning for favoring a border wall as a policy judgment." Def. Mot. at 17. Further, the government presents a handful of harmful effects that would stem from the disclosure of these communications, including that "[d]isclosure of a draft release with commentary from assorted government employees would not only inhibit DHS's candor but would also contribute to misinformation as, in draft form, it could contain incomplete and/or unverified information." *Id.* Plaintiff, for his part, contends that "DHS's argument that the Press Release is predecisional finds no support in FOIA because the decision to build a wall was made years before the press release": for example, by the time the Press Release was issued, President Trump had already issued Executive Order 13767, which called for the construction of a border wall, and the Customs and Border Protection Agency had already started construction on eight prototype barriers. *See* Pl. Cross-Mot., ECF No. 46, at 14–15.

Since a court "must be able to pinpoint an agency decision or policy to which a document contributed" to find that such document is predecisional, *Brennan Ctr. For Just. At N.Y. Univ. Sch. of L.*, 331 F. Supp. 3d at 93, the rub of the dispute is whether the Press Release itself constituted a DHS policy within the meaning of FOIA Exemption 5. If not, plaintiff is undoubtedly correct that communications related to the Press Release, which post-date the decision to build the Border Wall, would not be exempted from FOIA. *See* Pl. Cross-Mot. at 14 (As a matter of definition,

9

there can be no dispute that, "'[a] document is pre-decisional if it precedes, in temporal sequence, the decision to which it relates.'") (quoting *Ctr. For Investigative Reporting v. U.S. Customs & Border Prot.*, 436 F. Supp.3d 90, 100 (D.D.C. 2019)).

As might be expected, according to DHS, the withheld emails plaintiff contests "are internal communications containing judgment calls about how to convey to the public" the administration's "reasons for favoring a wall as a policy judgment," which falls within the ambit of Exemption 5 because "'choices about what rationales, justifications, and limitations to provide—and which to leave out—in articulating an important agency decision can involve difficult and substantive policy determinations.'" Def. Reply, ECF No. 47, at 8 (quoting *Campaign Legal Ctr. v. Unite States Dep't of Just.*, 34 F.4th 14, 24 (D.C. Cir. 2022)). Plaintiff concedes, at least at a high level, that "[d]efendant is correct that documents reflecting judgment calls about how to convey an agency decision may be properly withheld," but insists that "this is only true for the 'document that first communicates a policy decision' . . . because this initial document may 'shape and sharpen the underlying policy judgment or have direct consequences for ongoing agency programs and policies.'" Pl. Reply, ECF No. 48, at 6 (quoting *Campaign Legal Ctr.*, 34 F.4th at 24)). Thus, according to plaintiff, the documents at issue are not properly withheld because "the Press Release was not the first document to communicate the Trump administration's plan to ensure border security" through the construction of the Border Wall. *Id.*[5]

The one bite limitation Tempey seeks to impose on qualifying for Exemption 5 protection on documents relating to the communication of government policy to the public offers an overly formulaic reading of *Campaign Legal Center*. True, the literal language of the case states that a

---

[5] On February 21, 2017, for example, DHS issued a document "designed to answer some frequently asked questions about how the Department will operationally implement the guidance provided by EO 13767." Department of Homeland Security, *Q&A: DHS Implementation of the Executive Order on Border Security and Immigration Enforcement*, (Feb. 21, 2017).

10

document that "first communicates a policy decision" may sometimes "embody distinct policy determinations," but nothing in the Court's reasoning suggests that the timing of the communication matters more than its substance in determining whether it results from unique policy judgments. Indeed, "difficult and substantive policy determinations" abound in articulating "what rationales, justifications, and limitations to provide" in support of an agency determination, regardless of how many prior attempts the agency has made to convince the public that its judgment is sound. *Campaign Legal Center*, 34 F.4th at 24.

Instructively, in *Reporters Committee for Freedom of the Press v. Federal Bureau of Investigation*, the D.C. Circuit extended the deliberative process privilege to emails discussing a draft letter from the Director of the FBI to the *New York Times* defending the FBI's controversial tactic of impersonating members of the press to trick a suspect into revealing his identity. 3 F.4th 350, 362–64 (D.C. Cir. 2022). In so doing, the circuit court recognized that work product "figur[ing] out how to best promote and ensure the continuation" of a policy facing "intense congressional and public criticism" involved quintessential internal government discussions that the deliberative process privilege is meant to protect. *Id.* at 363. Just as the FBI in *Reporters Committee for Freedom of the Press* was protected from disclosing the sausage making of its public justification of an ongoing controversial policy, the communications at issue here, which reflect deliberation regarding how to convince dubious cohorts of the public that the Border Wall was and remains the best method to ensure border security, should similarly be protected. That the government had previously made overtures to the public about the Border Wall, *see* Pl. Reply at 6, does not alter the fact that consideration of what to include in the Press Release reflected policy judgments on "how to best promote and ensure the continuation" of its preferred policy.

The Second Circuit has not squarely addressed the issue, but a handful of district courts within the Circuit have concluded that governmental discussions about how to best communicate important policy decisions to the public contain substantive judgments that can bring such communications within the deliberative process privilege. In *Seife*, for example, the district court considered whether the deliberative process privilege could apply to communications regarding the scheduling of press events and the substance of the message to be communicated to the press during those events. 298 F. Supp. 3d at 614–17. The court rejected plaintiff's request to categorically exempt such documents from the deliberative process privilege, reasoning that "[e]ven when an underlying decision or policy has already been established by the agency, the decision of how, and to what extent, to convey that policy to the public may require input from many working components within the agency, or even an analysis of the underlying policy itself." *Id.* at 616. Moreover, the court in *Seife* was concerned that "a rule categorically exempting such decisions from the deliberative process privilege would force agencies to prematurely operate in a fishbowl." *Id.* at 616 (internal quotations omitted).[6] Similarly, the court in *New York v. United States Department of Commerce* considered drafts of an inter-agency letter defending an agency policy and held that "messaging" communications of this sort can be protected by the deliberative process privilege because such communications "involve substantive policymaking (or at least substantive policy refinement) of the type Congress has delegated to the agency." No. 18-cv-2921, 2018 WL 4853891, at *2–3 (S.D.N.Y. Oct. 5, 2018).

---

[6] Ultimately, the court in *Seife* refused to allow the State Department to withhold emails related to the press events because the court was not provided with "information describing . . . whether the communications involved recommendations for consideration in the deliberative process, such as suggestions made by junior officials to senior officials or decision-makers within the agency." 298 F. Supp.3d at 619. Thus, "the Court c[ould] not determine that the emails [were] deliberative in nature and subject to the privilege." *Id.* Here, by contrast, the withheld communications discuss edits to the Press Release, which by their nature involve recommendations and suggestions for consideration.

12

Here, in the contested debate over how best to secure the southern border—a debate DHS was, at the time, delegated authority to resolve—DHS's deliberation over which factors to emphasize to convince the public of the ongoing necessity of constructing the Border Wall "amount[s] to . . . more than deliberations over how to spin a prior decision"; instead, it is a "messaging decision" of the type that "Congress has asked the agency to make." *Id.* at *3. On these facts and this understanding of the law, defendant's motion on Tempey's challenge to the redaction of pre-Press Release communications pursuant to FOIA Exemption 5 is granted, and plaintiff's cross-motion is denied.[7]

The Exemption 5 analysis does not end there, however. DHS also made redactions to two documents post-dating the issuance of the Press Release, the contents of which "involve how to best address the concerns raised by the Press Release and whether further action should be taken, such as potentially removing the Press Release from DHS's website." Def. Mot. at 18. For example, in an email thread instigated when DHS forwarded internally an email from a member of the public expressing concern about the language used in the Press Release, the government redacted discussion "among DHS offices regarding how to address the concern raised and which leadership within various DHS sections to alert to the matter." *Id.* The government argues these

---

[7] Plaintiff also argues that DHS failed to comply with FOIA's segregability requirement by redacting entire pages of documents, including all drafts of and comments on the Press Release. *See* Pl. Cross-Mot at 17–18. Plaintiff states that "[i]t is clear from the final version of the Press Release that the drafts contain a list of facts supporting the Trump administration's decision to build the wall," and "factual materials that do not reflect an agency's deliberations are not covered by the deliberative process privilege." *Id.* at 18. Thus, "[b]ecause the drafts that DHS withheld contain factual, segregable material that does not reflect the agency's decision making, DHS has failed to meet its burden under FOIA." *Id.* While agencies are obligated to differentiate between exempt information and that which can be disclosed within any given document, the "evolution of the draft" is part of the agency's deliberative process. *Shinnecock Indian Nation v. Kempthorne*, 652 F. Supp.2d 345, 371 (E.D.N.Y. 2009). DHS's representation that it has complied with the segregability requirement is entitled to a presumption of good faith, *see Rutigliano v. U.S. Dep't of Just.*, No. 2:17-cv-6360, 2020 WL 1933638 (E.D.N.Y. Apr. 20, 2020), and plaintiff does not provide the Court with any evidence that DHS could have disclosed additional facts without exposing the deliberative process within the agency.

communications reflect policy-level judgments that should be protected by the deliberative process privilege. Def. Reply at 10.

Case law supports the government's argument that these communications should be exempted from FOIA productions. In *Protect Democracy Project v. United States Department of Defense*, the district court held that talking points drafted to assist the executive department in responding to media inquiries related to an airstrike in Syria was protected by Exemption 5, as "courts have generally found that documents created in anticipation of press inquiries are protected even if crafted after the underlying event about which the press might inquire." 320 F. Supp. 3d 162, 177 (D.D.C. 2018). Indeed, communications "can fairly be categorized as predecisional" where they were "drafted before and in preparation for communications with the press and public" and deliberative where, as here, they "focus on how to best respond to questions on these topics from the defendant's perspective." *Am. Ctr. For Law and Justice v. U.S. Dep't of Just.*, 334 F. Supp. 3d 13, 21 (D.D.C. 2018) (protecting communications strategizing response to leaked meeting between Attorney General Loretta Lynch and former President Bill Clinton that generated significant public interest).

Tempey agrees that "Exemption 5 may apply to communications regarding an agency's potential response" to press inquiries regarding one of its policies, but he tries to limit the application of Exemption 5 here by arguing that "the Press Release underlying the discussions is neither deliberative nor pre-decisional." Pl. Reply at 7–8. In sum and substance, Tempey argues that Exemption 5 cannot apply to what he labels the government's strategic public relations deliberations post-dating the issuance of the Press Release because the Press Release itself does not constitute a policy whose deliberative communications deserve protection. Given its conclusion that the Press Release is an agency policy within the meaning of FOIA Exemption 5,

*see supra*, the Court agrees with the government that communications reflecting how to respond to public concern regarding that policy is similarly protected from disclosure by Exemption 5. As a consequence, with respect to the two documents post-dating the issuance of the Press Release that are the subject of this FOIA request, the government's motion for summary judgment under Exemption 5 is granted, and plaintiff's cross-motion for summary judgment is denied.

That conclusion does not end the analysis, however, as the disclosure shield DHS would install to save its documents from release extends beyond Exemption 5. Specifically, DHS also redacted email addresses, including domain information, for government personnel from 96 documents pursuant to FOIA Exemption 6. Def. Mot. at 22. DHS disclosed the names of the individuals associated with the redacted email addresses, excepting six individuals who, according to DHS, "were not public figures or senior leaders, and were not individuals whose actions, decisions, or statements were subjected to press coverage." *Id.* at 18. Plaintiff does not challenge the withholding of the email addresses and names of the six low-level employees, but, nonetheless, "requests that DHS release the title and position of all individuals whose names were redacted." Pl. Cross-Mot. at 20. As a result, the only issue presented for resolution is whether DHS should be directed to provide the title and position of the six employees whose names it did not provide plaintiff in the FOIA productions it did make in response to Tempey's requests.[8]

FOIA Exemption 6 exempts from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personally privacy." 5 U.S.C. § 552(b)(6). "Congress's primary purpose in enacting Exemption 6 was to protect

---

[8] In his reply brief, plaintiff notes his entitlement "to the names of the [six] employees," even though he "initially opted to request the mere job titles of the relevant employees as a lesser request for information." Pl. Reply at 10. The Court need not struggle to discern whether Tempey's equivocal language in his reply is a request for such information since his opening papers did not squarely make such a request, and, for that reason, such a request would be denied. *See, e.g.*, *Gatson v. City of New York*, 851 F. Supp. 2d 780, 796 (S.D.N.Y. 2012); *Quintero v. Rite Aid of N.Y., Inc.*, No. 09-cv-6084, 2011 WL 5529818, at *19 (S.D.N.Y. Nov. 10, 2021).

individuals from the injury and embarrassment that can result from the unnecessary disclosure of personal information." *U.S. Dep't of State v. Washington Post Co.*, 456 U.S. 595, 599 (1982). In deciding whether an agency has properly withheld records pursuant to Exemption 6, the Court first determines whether the records are personnel, medical, or similar files. *Cook*, 758 F.3d at 174. The Second Circuit considers a record to be a "similar file" "if it contains personal information identifiable to a particular person." *Clevenger v. U.S. Dep't of Just.*, No. 18-cv-1568, 2020 WL 1846565, at *11 (E.D.N.Y. Apr. 3, 2020). "Similar files" include "bits of personal information, such as names and addresses, the release of which would create a palpable threat to privacy." *Telematch, Inc. v. U.S. Dep't of Agric.*, 45 F.4th 343, 351 (D.D.C. 2022). If a court determines that a record falls within the ambit of Exemption 6, the court must then balance the public need for the information against the individual's privacy interest to determine whether disclosure would constitute a clearly unwarranted invasion of privacy. *Clevenger*, 2020 WL 1846565, at *10.

Balancing the public and privacy interests "requires another two-step process to determine first whether disclosure would compromise a substantial, as opposed to *de minimis*, privacy interest," and "[i]f no significant privacy interest is implicated, FOIA demands disclosure." *American Oversight v. U.S. Gen. Servs. Admin.*, 311 F. Supp.3d 327, 345 (D.D.C. 2018) (cleaned up). If a substantial privacy interest does exist, the court then is left to "address the question whether the public interest in disclosure outweighs the individual privacy concerns." *Id.* "The privacy side of the balancing test is broad and encompasses all interests involving the individual's control of information concerning his or her person." *Wood*, 432 F.3d at 88.

Importantly, Exemption 6 "does not categorically exempt individuals' identities because the privacy interest at stake may vary depending on the context in which it is asserted." *Am. Oversight*, 311 F. Supp.3d at 346. "Whether disclosure of an individual's name is a significant or

16

a *de minimis* threat to privacy depends on the characteristic(s) revealed by virtue of being on the particular list, and the consequences likely to ensue." *Id*. (quotations omitted).

The Court agrees with defendant that "[b]eing identified [as] a potential actor in a story alleging government alignment with white supremacist rhetoric would subject this person to the possibility of harassment and great distress." Def. Mot. at 24. Thus, disclosure of the job title of an employee who participated in drafting the Press Release, which can be easily cross-refenced to determine that employee's name, clearly represents a significant threat to privacy. At the same time, the Court does not see a substantial public interest in knowing where on an organizational chart lower-level employees sit that warrants intruding on their legitimate privacy interests. This conclusion is consistent with the guidance from well-reasoned precedent that a high rank and senior leadership role weighs in favor of disclosure of personal information, while staff level positions do not. *See BuzzFeed Inc. v. U.S. Dep't of Just.*, No. 21-cv-7533, 2022 WL 2223124, at *4 (S.D.N.Y. June 21, 2022) ("Courts have drawn distinctions between political appointees or senior managers and mere staff-level career civil servants."); *accord Wood*, 432 F.3d at 88.[9] Tempey obliquely suggests that disclosure is warranted because the agency did not explain "the positions in the chain of command of the parties to the documents," Pl. Cross-Mot. at 20, but agencies are only required to disclose relative positions in the agency's "chain of command" to determine whether a document reflects policy determinations—an Exemption 5 inquiry that has no bearing on an individual's privacy rights in connection with Exemption 6. *See* Def. Reply at 12 (citing *Citizens for Responsibility & Ethics*, 583 F. Supp. 2d at 157). Given the strong privacy interests and lack of a compelling public interest in disclosure, the government's motion for

---

[9] Consistent with the lesser public interest courts recognize in the identities of lower-level employees, one of the individuals whose identity has been protected here responded to an email relaying concerns about the Press Release that the issue was "above [his] paygrade" and forwarded the email to a senior employee whose identity has already been disclosed to Tempey. *See* Def. Mot. at 23–24.

summary judgment based on Exemption 6 is granted, and Tempey's cross-motion to compel the release of the job titles of the employees who participated in drafting the Press Release and whose names DHS has withheld is denied.

## Conclusion

For the foregoing reasons, defendant's motion for summary judgment is granted, and plaintiff's cross-motion is denied. The Clerk of Court is directed to enter judgment accordingly and to close this case.

So Ordered.

Dated: Brooklyn, New York
       January 21, 2025

*/s/ Eric N. Vitaliano*
ERIC N. VITALIANO
United States District Judge